UNITED STATES v. WILLAMETTE VAL. & C. M. WAGON ROAD CO. et al.

(Circuit Court, D. Oregon. December 16, 1892.)

No. 1,611.

1. PUBLIC LANDS—GRANTS FOR WAGON ROADS—PERFORMANCE OF CONDITION.
The company to which the state of Oregon transferred the grant made to it in aid of a certain wagon road by the act of July 5, 1866, (14 St. p. 89, c. 174,) constructed a road which was regularly used as such, though the grades were heavy and the bridges few. It crossed the S. river by fords which were dangerous when the snows were melting in the spring, but at such times the snow itself in the mountains prevented through travel on the road. *Held*, that in view of the nature of the country, the needs of the time, the modes of travel then in use, and the value of the grant, the road was such as to satisfy the requirements of the granting act.

2. SAME—GOVERNOR'S CERTIFICATE—PERSONAL INSPECTION.
The provision of the act that the lands might be disposed of from time to time upon the certificate of the governor of Oregon that 10 continuous miles of the road were completed, did not require or contemplate that he should make a personal inspection of the road to determine the fact.

3. SAME—FRAUDULENT PROCUREMENT—EVIDENCE.
It was shown that the persons appointed by the governor to inspect the road were paid by the road company, and there was testimony that one

of the inspectors was under the influence of liquor furnished by the company. This he denied. It was shown, on the other hand, that there was no provision for their payment by the state; that the company, when it requested the inspection, was notified that it would have to compensate the inspectors; and that they were not appointed by its procurement or suggestion. *Held*, that these facts would not support a charge that the certificates were procured by the fraud of the company.

4. SAME—DEFECTS IN FORM.
One of the certificates was to the effect that a plat of one section of the road had been filed in the governor's office, and showed that "that portion of the road commencing and ending as designated on the map has been completed as required by the act of congress." *Held*, that this was not fatally defective where the evidence showed that the governor's agent had caused an inspection to be made of that part of the road, and that the certificate was made in pursuance of his report.

5. SAME.
A second certificate, to the effect that the governor had "examined and accepted" a certain section of the road, is sufficient, as it is equivalent to certifying that the road has been examined, approved, and accepted, because found to be constructed according to law.

6. SAME—GRANT IN PRÆSENTI—BONA FIDE PURCHASERS.
The act of July 5, 1866, (14 St. p. 89, c. 174,) which grants a portion of the public lands to the state of Oregon in aid of the construction of a wagon road, is a present grant of the fee simple upon condition subsequent; and bona fide purchasers of the land will not be denied protection as such on the ground that no patents had been issued for the land when they purchased.

7. SAME—CONDITION SUBSEQUENT.
Forfeitures for breach of the condition that the road should be completed in a specified time could only be enforced by legislative enactment or judicial proceedings of the United States, in the absence of which the road might be completed, and forfeiture thereby prevented, even after the time limited had expired.

In Equity. Bill filed by the United States in conformity to the act of March 2, 1889, (25 St. p. 850, c. 377,) against the Willamette Valley & Cascade Mountain Wagon Road Company, David Cahn, Alexander Weill, and others, to forfeit lands. Bill dismissed.

Franklin P. Mays and Albert H. Tanner, for United States.
Henry Ach and C. E. S. Wood, for defendants David Cahn and Alexander Weill.

GILBERT, Circuit Judge. By act of congress of July 5, 1866, there were granted to the state of Oregon, to aid in the construction of a military wagon road from Albany to the eastern boundary of the state, three sections of the public lands per mile for every mile of said road as the same should be constructed. The act provided that the road should be constructed "with such width, gradation, and bridges as to permit of its regular use as a wagon road, and in such other special manner as the state of Oregon may prescribe, and that it shall be and remain a public highway for the use of the government of the United States." The act further provided that the legislature of Oregon might dispose of the lands for the construction of the road as the work progressed, whenever the governor of the state of Oregon should certify to the secretary of the interior that 10 continuous miles of the road had been completed;

and that, if said road should not be completed in five years from the date of the act, no further sales should be made, and the land remaining unsold should revert to the United States. By act of the legislature of Oregon, approved October 24, 1866, the said lands so granted, and all rights under the grant, were transferred to the defendant the Willamette Valley & Cascade Mountain Wagon Road Company, a private corporation of the state of Oregon.

Within the time limited for the construction of the road, the whole line of the road, from Albany to the state line, 448.7 miles in all, was certified to have been completed in the manner required by the act by four several certificates of the governor of Oregon, the first bearing date April 11, 1868, and the last of date June 24, 1871. On June 18, 1874, congress passed an act recognizing the transfer to the wagon road company, and authorizing the issuance of patents to that corporation for all the lands so granted to the state, with the following proviso: "This shall not be construed to revive any land grant already expired, nor to create any new rights of any kind, except to provide for issuing patents for lands to which the state is already entitled." On June 19, 1876, under this statute, patent issued to the wagon road company for 107,893 acres of the lands. On August 19, 1871, the wagon road company sold and conveyed the land grant to H. K. W. Clarke, for a consideration, as recited in the deed, of $75,000, and on September 1st of the same year Clarke conveyed the same to David Cahn, in trust for said grantor and for T. Egenton Hogg and Alexander Weill.

In March, 1878, complaint was made to the secretary of the interior by citizens of Oregon that the road had not been constructed according to the provisions of the original granting act, and two years later a special agent was appointed to investigate and report upon the matter contained in said complaint. In October, 1880, the agent made his report to the effect that the road, and particularly the eastern portion thereof, had not been constructed as required by the act of congress. His report, with the evidence accompanying the same, was placed before congress. In the house of representatives the matter was referred to the committee on military affairs, and that committee, after investigation, reported that no action be taken. Subsequently, in February, 1882, further charges and proofs were laid before congress, which, in the house, were referred to the committee on public lands, and, in the senate, to the committee on military affairs. Both committees reported that no action be taken by congress, alleging as a reason for that conclusion "that the executive department of the government had ample authority in law without any instruction from the legislative department." The secretary of the interior thereupon made an investigation of the matter, and as the result thereof directed the commissioner of the general land office to proceed and certify the lands for patent. In October, 1882, patents issued to the wagon road company for 440,856 acres of the lands which had then been selected. Since that date no patents have issued for the remaining lands claimed to have been earned by the wagon road company, and 312,-691 acres of the same remain unpatented.

On March 2, 1889, congress passed an act directing the attorney general to cause a suit to be brought against all claimants of the lands so granted for wagon road construction, "to determine the question of the seasonable and proper completion of said road in accordance with the terms of the granting act, either in whole or in part, and the legal effect of the several certificates of the governor of Oregon of the completion of the road, and to declare forfeited to the United States all land not earned in accordance with said act, saving and reserving the right of all bona fide purchasers of such lands for valuable consideration," and providing that said suit or suits should "be tried and adjudicated in like manner and by the same principles and rules of jurisprudence as other suits in equity are therein tried." In pursuance of the authority so conferred upon the attorney general, this suit was commenced by the United States against the wagon road company and the subsequent grantees of the lands in question. The bill sets forth the facts above enumerated, and alleges that no portion of the road was constructed, as required by the act, within the time limited therein; that the certificates of the governor were fatally defective in form, and were procured by the fraud and misrepresentation of the wagon road company, and that the present grantees of the land from the wagon road company purchased the same with knowledge of said facts.

To this bill the defendants Alexander Weill and David Cahn make answer, setting forth the following defenses: (1) That the road was completed in all respects as required by the granting act, and within the time therein limited. (2) That the certificates of the governors of Oregon were by the act made conclusive evidence of the completion of the road, and that upon the strength of said certificates the defendants became bona fide purchasers of the lands. (3) That, conceding that the road may not have been completed within the time limited, nevertheless, subsequently, and before any declaration of forfeiture by the United States, the road was fully completed in the manner required by the act, and thereby the forfeiture was avoided. (4) That the defendants, after purchasing said lands, relied upon the action of congress in 1874 in directing the issuance of patents to said land, and upon the result of the investigation made by congress above referred to, and the action of the secretary of the interior after his investigation in 1882, directing the issuance of patents, and in consequence thereof expended large sums of money in and about said lands and in repairing said road, whereby the United States have become estopped to claim a forfeiture.

The first question to be decided under the evidence is whether the road was seasonably and properly constructed. Upon this point the evidence is voluminous and to some extent conflicting. The conflict arises mainly from a difference of opinion as to the nature and quality of road required to be constructed by the act. Was this road constructed of such width, gradation, and bridges as to permit of its regular use as a wagon road? It would seem that the question must be answered in such light as may be had from the nature of the country to be crossed, the needs of the time, the

means of travel then in use, the difficulties to be overcome, and the value of the land grant.   In the light of such considerations and the testimony of the witnesses, I am convinced that within the time limited in the grant the road was fairly well constructed from Albany as far east as the Des Chutes river.   It is true that it would have been a better road with more bridges, easier grades, and better turnouts for teams, but it does not appear that for want of these improvements its regular use as a wagon road was ever interrupted, or that any travel was diverted from the road on account thereof.   The fords of the Santiam were difficult and dangerous when the snows were melting in the spring, but at such times the snow in the mountains prevented all through travel on the road.   As soon as the snow was gone from the mountains the Santiam became fordable.   There was an extensive travel upon the road in the earlier years of its use, and the evidence is that it compared favorably with other mountain wagon roads in the state, similarly located and similarly aided by grant of public lands, and that during those years there was no public complaint of its defective construction.   The remainder of the road, from the Des Chutes to the eastern boundary of the state, was constructed without bridges, and with but little outlay of money or work. A line was surveyed through, and marked with mile stakes.   Here and there some grading was done, and some rocks removed to facilitate the crossing of ravines or fords.   There is no doubt that if wagon trains had passed along the line soon after the survey they could have followed the stakes to the end of the road, and, if any considerable travel had ensued, a passable wagon road would have been worn through the bunchgrass and the sagebrush of that open country, but no such through travel followed. There was at that time no necessity for a road further east than Harney valley.

The settlers going east of the mountains from the Willamette valley diverged in all directions soon after crossing the mountains, and, the extreme eastern portion of the road being wholly unused, its stakes and marks soon disappeared from sight, and a few years later a considerable proportion of it was fenced in by settlers.   The principal defect in the road as originally built, east from the Des Chutes, was in the difficulty of crossing the streams.   At ordinary stages they were all fordable, with more or less trouble, but much of the time they were impassable. The travel on this part of the road, especially in crossing the Des Chutes, Silver creek, and Silver river, was often interrupted on account of high water, and I am of the opinion that the evidence shows that, for want of bridges, this part of the road was not so constructed as to permit of its regular use as a wagon road. In arriving at this conclusion I do not in any way impugn the good faith of the inspectors.   It is a matter upon which opinions may differ.

What is the legal effect of the certificates of the governors? It is claimed on behalf of the United States that all the certificates are void—First, because they are not and do not pur-

port to be based upon a personal inspection of the road; second, because they were obtained by the fraud and misrepresentation of the wagon road company, and that the first two certificates are otherwise fatally defective in form.

The contention that the act of 1866 required a personal examination of the road by the governors before they should issue the certificates is not supported by the language of the act or by any fair or reasonable construction of its terms. The grant was made to the state of Oregon, and was mainly for its benefit. The only advantage reserved to the United States was the free use of the road for transportation of troops and stores. It was necessary that some person or tribunal be designated to examine and receive the road. Congress justly assumed that the governor of the state—its highest official—would in a matter of such public importance, at the proper time, and before issuing the certificate, take such steps as might be necessary to ascertain whether the road had actually been constructed in the manner required by the act, and the decision of the governor was made the conclusive and only evidence of that fact.

The charge that the certificates were procured by fraud and misrepresentation has no support in the evidence. It is based upon the fact that the compensation of the inspectors for their services in that capacity was paid by the wagon road company, and that some of the witnesses testified that one of the inspectors, R. M. Powers, while inspecting the road, was under the influence of liquor furnished by the road company, and that one of them testifies that Powers said he was making a good thing out of the inspection, all of which is denied by Powers. It is shown that there was no public fund out of which to pay for inspection of the road. No appropriation had been made for that purpose, either by the act of congress or by the legislature of Oregon. The officers of the company, when applying for inspection, were informed by the governor that they must defray the expense of the examination. They accordingly did so, and the amount paid does not appear to have been more than a reasonable compensation. The inspectors in three instances accompanied the workmen while constructing the road and repairing the same, and caused the road to be completed to their approval. I fail to find in any of these facts any necessary impeachment of the integrity of any of the reports of the inspectors. There is no evidence that either of these inspectors was selected at the suggestion or by the procurement of the company or any of its agents, and there is no evidence whatever that either of the executive officers who made the certificate had any knowledge or intimation of any fraud or misrepresentation of the wagon road company, or had heard any rumor or complaint that the land grant had not been justly earned.

There are defects in the form of the first certificate, but not such as to avoid its legal effect as such. It certifies that a plat of that section of the road has been filed in the governor's office, "and shows that portion of the said road commencing and ending as designated on the map has been completed, as required

by the act of congress." This would indicate, from the language used, that there had been no inspection of the road itself, and that the officer certifying declared only what the map expressed. The testimony shows, however, that the governor's agent had caused an inspection of this portion of the road, and that the certificate was made in pursuance of his report. It was the evident intention of the maker of this certificate to certify that the road had been completed according to law. It was so understood and accepted by the wagon road company, and it was so received by the officials of the United States. Moreover, if there were serious defects in its form, the error was subsequently cured by the "omnibus" certificate issued by the governor in 1871, whereby the completion of the whole road was certified in due form.

The second certificate is alleged to be defective for the reason that instead of certifying that the portion of the road therein referred to has been completed, it states that the governor has "examined and accepted" the same. The difference is one of form, and not of substance. The language employed is equivalent to a certificate that the road has been examined and has been approved and accepted, because found to be constructed according to law. The evidence is clear that the defendants, in purchasing the lands in 1871, relied upon the certificates as conclusive evidence that the road had been completed and the land grant earned. There is no evidence that they had notice of any fraud or misrepresentation on the part of the road company, or that any fact came to their notice that would have imposed upon them the duty of examining the road to see whether it had been constructed according to law. The purchase was made without secrecy, and after open and extended inquiry as to the value of the lands. The price paid was not disproportionate to the market value of the lands at the time.

The contention of counsel for the United States that the defendants could not have occupied the position of innocent purchasers so long as patents for the land had not issued, is not supported by the authorities. The grant was a grant in praesenti. The language of the granting clause was "that there be and hereby is granted to the state of Oregon." This made it a present grant of an estate in fee upon condition subsequent, notwithstanding the fact that the lands were required to be subsequently selected. U. S. v. Wallamet Val. & C. M. Wagon Road Co., 42 Fed. Rep. 357; Schulenberg v. Harriman, 21 Wall. 44; Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 491; Van Wyck v. Knevals, 106 U. S. 360, 1 Sup. Ct. Rep. 336. Patent was not necessary to convey the title, and when it issued it was only evidence of a title that had already passed. Rutherford v. Greene's Heirs, 2 Wheat. 196; Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. Rep. 985; Van Wyck v. Knevals, supra. The defendants are clearly shown to be bona fide purchasers. As such, their rights would be conserved in a court of equity under the general principles of jurisprudence governing the court irrespective of the statute, but in this case congress has seen fit to expressly declare, in the act

authorizing the prosecution of this suit, that the interests of all such purchasers, if any there be, shall be protected.

The third defense is also established by the evidence. The act of congress of July 5, 1866, required the completion of the road within five years from that date, and it provided that thereafter no further land should be sold, but that the land then remaining unsold should revert to the United States. Only the grantor could take advantage of the nonperformance of this condition subsequent. Until a forfeiture was asserted, the title remained unimpaired in the grantee. Here the condition subsequent was attached to a public grant. The forfeiture, instead of being asserted by re-entry, or its equivalent, as in the case of a private grant, could only be declared by judicial proceedings,—equivalent to an inquest of office at common law,—or by legislative enactment amounting to an assertion of title for a breach of the condition. Schulenberg v. Harriman, 21 Wall. 44; U. S. v. Repentigny, 5 Wall. 211. There was no attempt to demand or claim a forfeiture of this land grant on the part of the United States until congress passed the bill which authorized the prosecution of this suit. At any time prior to that date the grantee could lawfully comply with the condition subsequent, and thereby defeat the forfeiture. The evidence shows that this was done. In 1887 the whole road was repaired and completed by the erection of bridges and the construction of proper grades. The expenditure for that purpose was $89,000, and there can be no doubt that then, if not before, the road was completed in all respects in compliance with the terms of the granting act.

On exceptions to parts of the answer it was held that the defense of estoppel as pleaded therein was available to these defendants as against the United States, and it is unnecessary here to repeat the reasoning or the authorities upon which that conclusion was reached. 54 Fed. Rep. 807. It is shown by the evidence that the defendants relied upon the action of congress as expressed in the act of 1874, directing the issuance of patents, its subsequent treatment of the complaint against the road, and its report that no action be taken, the result of the investigation by the secretary of the interior and the subsequent issuance of patents, and that in consequence thereof they altered their relation to the subject-matter of this suit by expending large sums in repairing the road, in paying fees to the government, in payment of taxes, and expenses of caring for the lands, amounting in the aggregate to $142,315.38.

These facts render it inequitable that the United States should at this late date, and after such long nonaction and acquiescence, assert title to the lands, or claim a forfeiture of the same for a failure to construct the road within the five years succeeding the land grant of July 5, 1866. The bill will therefore be dismissed.