STATE OF NEBRASKA, PLAINTIFF, V. WOODRUFF BALL ET AL.,
DEFENDANTS.

FILED NOVEMBER 28, 1911.   No. 16,050.

1. **Public Lands: SCHOOL LANDS: TITLE.** Upon the approval by the
federal government of a survey of the interior lines of a town-
ship, the state's title to section 36 vests absolutely.

2. **Boundaries: LOCATION.** Monuments erected by the government sur-
veyor to mark the section corners according to his survey will
control, although in conflict with his field notes. If the monu-
ments have been obliterated, but their location can be ascertained
from a consideration of the testimony of witnesses who know and
testify to the fact, the site thus established will control. If the
monuments have been destroyed and their original location can-
not be established by other proof, recourse may be had to the
field notes of the original survey.

3. ——: ——. Where the monuments which marked corners of
the original survey are lost or obliterated and their original
location cannot be established by other evidence, and the field
notes returned by the government surveyor show that he estab-
lished an interior section corner on a straight line between the
exterior lines of the township and determined its location by
courses and distances, the notes are to be accepted as presump-
tively correct, and can only be overcome by clear and satisfactory
evidence that the corner was established at a point other than as
thus described.

4. ——: ——: EVIDENCE. Proof that the government surveyor
was careless or dishonest in the matter of other surveys, and
that he probably made an error of one-half a mile in locating
other section corners within the township, will not prevail over
his field notes of the particular corner, corroborated by the
testimony of one witness who testifies that within two years
after the survey he discovered the disputed corner near the point
where it should be according to the field notes, and that a corner
about a half mile eastward, contended for as the section corner,
was also discovered by him, but it bore all of the indications of a
government quarter corner.

5. **Estoppel: SCHOOL LANDS.** Mere delay on the part of the state in
asserting title to a disputed tract of school land will not bar its
right to quiet title thereto.

6. ——: ——. Nor will the unauthorized acts of taxing officers
in levying and collecting taxes upon such lands estop the state

from asserting its title, even though the sums collected have been appropriated to public use.

7. **Boundaries: EVIDENCE.** The evidence in this case commented upon in the opinion, and *held* to sustain the state's contention that the land in dispute is part of section 36, in township 30, range 32 west of the sixth P. M., in Cherry county, Nebraska.

ORIGINAL action by the state to quiet title to a certain tract of land. *Decree for plaintiff.*

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton,* for plaintiff.

*Baxter & Van Dusen, F. M. Tyrrell* and *F. M. Walcott,* contra.

ROOT, J.

This is an original action to quiet in the plaintiff title to about 134 acres of land lying, as alleged, within the northwest quarter of section 36, in township 30 north, range 32 west of the sixth principal meridian, in Cherry county, Nebraska.

The plaintiff alleges that in November, 1882, the United States caused township 30 to be surveyed, and that on May 5, 1883, the surveyor general for the district of Iowa and Nebraska approved a plat of the survey, which had been theretofore filed in his office, whereby it acquired an absolute title to the land.

The defendant admits in his answer that the township was surveyed and the plat of the survey approved, but alleges that the survey was not in fact made according to the plat, but that by mistake the surveyor actually established the monuments of his survey on the ground so as to locate the west line of section 36, 33 chains and 11 links east of the true line of the section had the survey been correctly made; that the defendant filed on part of section 35 according to that survey, and that Mr. W. W. Ault, a government surveyor, under the authority of a special act of the congress of the United States, resurveyed the

township, and confirmed the McElroy survey, so far as it affected the defendant's land; that this survey was also approved by the surveyor general, and subsequently a patent was issued by the United States government to the defendant for this land.

As we understand the arguments of counsel, there is but little difference of opinion concerning the principles of law that should control the case. Independently of the defense of an alleged estoppel of the plaintiff to reclaim this land, should it be held that title ever vested in it, the parties substantially agree that if the "Ball corner," located 45 chains and 48½ links west of the northeast corner of section 36, is the site of the corner established in 1882 by McElroy, the government surveyor, as the northwest corner of the section, we should find for the defendant. We cannot, within the limits of this opinion, refer to all of the evidence upon this point, but something of its substance will be given.

In 1879 the exterior lines of the township were surveyed for the government by S. C. McElroy. In 1882 McElroy surveyed and subdivided the interior lines of the township, and in May, 1883, his plat of the survey was duly approved by the surveyor general. One witness testified that McElroy's field notes recite that he retraced the exterior lines of the township before commencing to survey the interior lines, but we have not discovered any evidence of this fact. Through sections 6, 5, 4, 3, 2, 11, and 12, the Snake river, a stream about four rods in width, runs eastward in a tortuous course, and across the southern tier of the sections the Boardman creek flows eastward approximately in the center of the Boardman marsh, which is about 23 chains wide, but does not extend to either the south line of the township or the northern boundary of the south tier of sections. Between the Boardman marsh and the Snake river the soil is sandy, and is partially covered with bunch grass, soap plants and other vegetation indigenous to the sandhills, but in many places is bare of all vegetation for spaces of from a few

square inches to much larger areas; the surface of the ground is broken by hills and numerous irregular shaped valleys and pockets.

The testimony of Mr. McElroy was not taken, nor does it appear where he resides, if in life. In 1897 a county surveyor, Mr. Tait, surveyed parts of the township, and came to the conclusion that the point where the Ball corner is located was the northwest corner of section 36, and made a plat demonstrating that all of the interior sections of the township were approximately one-half mile too far east. In 1898 Mr. Estabrook, then county surveyor, came to the conclusion that all of the interior corners were a half mile too far west. Subsequently Mr. Estabrook came to the conclusion that the asserted error of the government surveyor should be corrected in the eastern half of the township, and prepared and filed a plat accordingly. Honorable T. J. Howard accompanied Mr. McElroy at the time the interior lines were surveyed, and testifies in substance that the sections were surveyed in tiers north and south across the township, and monuments erected every mile and half mile; that the surveyors could not cross the Boardman marsh, but went around, first erecting a mound on the edge of the marsh, and then another mound on the other side, and the line was controlled by the surveyor in charge of the transit, who, by placing it on the higher elevations and using the back sight, kept the lines true; that the witness observed pits and mounds within the township, evidently constructed by other surveyors, but by whom he does not know.

Mr. Erickson, in 1884, filed on a homestead in the vicinity of the land in dispute, and within a year thereafter surveyed the north line of section 36 and prolonged the line westward for several miles. At this time, according to his testimony, the point now identified as the Ball corner had all of the indicia of a quarter corner—a stake with one pit to the east and another to the west. He also discovered the northwest corner of section 36 near the top of a hill. A small mound and four pits were there

visible; two of the pits were on top and two on the side of the hill, but those on the hillside were then nearly obliterated. This corner, the witness states, was "a long mile" west of the northeast corner of the section. He also testifies that he discovered government corners to the westward, with pits, mounds and marked stakes. This witness assisted Mr. Tait in making the survey which first recognized the corner, identified by the witness as the quarter corner, as the northwest corner of the section; a mound was raised and pits were dug by the chainman, under Tait's directions. No witness testifies that prior to this time there was any physical evidence that a government section corner had been located at this point. After this controversy arose, the earth was carefully removed for 10 feet in all directions from the stake and to a depth of several inches, and no evidence was obtained to prove that four pits had been dug in the soil. The outlines of a pit about two feet square were observed, but the area and location of this pit refute the conclusion that it could have been constructed by McElroy or by any other government surveyor. Erickson positively identifies this corner as a quarter corner. To accept the conclusion that it is the site of the northwest corner of the section as located by McElroy, we must reject Erickson's testimony, and accept, first, the conclusion that several of the McElroy corners have been located, and, second, that they are a half mile distant from the point where they should have been, and then conclude that this error was uniform throughout the survey of the interior of the township, and in consequence the Ball corner must have been the northwest corner of the section as located by Mr. McElroy.

In 1907 Harvey, the state surveyor, after removing the surface of the soil at a point approximately a mile west of the Ball corner, discovered the outlines of four pits so situated with respect to each other as to indicate that they were dug by a government surveyor, or by some person desiring to imitate the work of a government surveyor; one-half mile further westward the remains of a

red cedar stake was found, but no pits were discovered or other evidence found that pits had been dug; one-half mile further westward the outlines of four pits and an old red cedar stake were found; one-half mile further westward slivers of a red cedar stake were found and the outlines of two pits east and west; one mile further westward the remains of an old red cedar stake and two pits were found; about four miles northward from the point a mile west of the Ball corner, Mr. Ault, a deputy government surveyor, subsequently found what he contends is a government corner. At this point the outlines of four pits were visible and an iron rod protruded from the ground. This point is within a few chains of the corner common to sections 2, 3, 10, and 11 and to a bend in the Snake river, according to the calls in McElroy's field notes. This stream flows where it did in 1882, and, if this corner be accepted as a McElroy corner, it tends strongly to sustain an argument that it was located upon the ground a half mile east of the point where it should have been established. There is also evidence to the effect that, in 1886, a county surveyor, DeBerry, found government corners intact in the southwest part of the township, with stakes marked to indicate the section, town and range, and that settlers locating their claims according to his surveys located a half mile east of the true lines according to McElroy's field notes. There is also testimony of old settlers in the township to the effect that points in the interior of the township contended for by the defendant as government corners, but west of section 36, were such corners, and that they are a half mile east of the points described in McElroy's field notes. On the other hand, a diligent search did not disclose any section corners or evidence of section corners to the north and in line with the Ball corner; no one contends any such corners were ever seen. McElroy's field notes of the survey of the west line of section 36 corresponds closely with the field notes of that line run 18 years thereafter by Ault, and by Sweitzer 7 years after Ault's survey. In

all of these surveys the calls for the Boardman marsh and the Boardman creek create a strong probability that the lines were actually traced by McElroy along the western boundary of the section.

Mr. Sweitzer, government expert, and witness for the state, testifies that in his opinion McElroy did not locate the northwest corner of section 36, but the point where the witness plowed up and removed the surface of the soil, and where he says the McElroy field notes call for the corner, is on a sidehill.  Mr. Erickson testifies that the section corner discovered by him was on a sidehill, and it is not unreasonable to believe that, during the 15 years intervening between the McElroy survey and Tait's survey, the action of the wind and the rain beating upon this hillside and the tramping of cattle have obliterated all the pits, so that even an expert might believe, after a careful investigation, that none were dug.  The fact that McElroy erroneously located some of the interior section corners in another range of sections does not necessarily nor logically prove that the corner under consideration was erroneously located.

If the monuments erected by the government surveyor have been obliterated, and no witness can fix their original location, and the government surveyor's field notes returned to the surveyor general show that section lines were established on straight lines between the township corners and determine their location by courses and distances, the notes should be accepted as presumptively correct, and should only be overcome by clear and satisfactory evidence that the surveyor established the corners at other points. *Resurrection Gold Mining Co. v. Fortune Gold Mining Co.*, 64 C. C. A. 180; *Hanson v. Township of Red Rock*, 4 S. Dak. 358; *Taylor v. Fomby*, 116 Ala. 621.  Furthermore, the map returned and approved by the surveyor general gives the area of section 36 as over 638 acres; whereas, if the defendant's theory be accepted, the area will be diminished over 120 acres.  In case of doubt or confusion, the quantity actually named in the

grant is entitled to some consideration. *Ely's Administrator v. United States*, 171 U. S. 220. The map, therefore, should be considered in connection with the field notes in fixing the quantity of land segregated as section 36. The line from the northeast corner of section 36 westward to the northwest corner of section 31 is 476.78 chains in length. There is nothing in the record to advise us that the deficiency of 3.22 chains was not allotted by Mr. McElroy to section 30, as the law provides. We do not feel like accepting any alleged corner on that line as the interior corner of any section west of section 36, so that the doctrine of proportionate measurements is not involved, and we feel at liberty to give to the government field notes such credence as we think proper.

From all of the evidence before us, we find that whatever mistake McElroy may have made in locating the interior section corners in township 30, the proof does not show that he made a mistake in locating the northwest corner of section 36; that the field notes returned to and approved by the surveyor general and the plat prepared by him, when considered in connection with the testimony of the witnesses, sustain the allegations in the petition, and require a decree in the plaintiff's favor, unless it is estopped to maintain this action.

We have not discovered any evidence tending to prove that the state induced the defendant to occupy any part of section 36. Before filing on section 35, but taking possession of part of 36, the defendant advised with his lawyer, went to the premises in company with Mr. Tait, and accepted his statement that the Ball corner was the northwest corner of 36. The defendant knew, or should have known, that no part of any deficiency of area in the township would be taken from this section if it were properly surveyed. The northeast, the southeast and the southwest corners of the section are visible in the township lines, and the field notes of Mr. McElroy's survey were of record. Mr. Ball made no inquiry of the commissioner of public lands and buildings, nor did he interview

State v. Ball.

the state's tenant, who was asserting a right to all of the section, and actually using the hay cut and cured on part of the disputed territory. There is no proof of facts sufficient to create an estoppel between individuals, much less against the sovereign state.

After the United States government issued a patent to the defendant for section 43 (the description given by surveyor Ault for the disputed territory) the taxing officers of Cherry county levied taxes thereon for state, school district and county purposes, and the defendant paid the taxes. These facts the defendant contends estop the state from asserting title to the real estate, and *People v. Hagadorn*, 104 N. Y. 516, is cited by him to sustain his contention. That case was controlled by a finding that a comptroller's deed to the state for lands sold for taxes, which were in part invalid, was void. In answer to an argument that the state might ignore the deed and assert title as the original proprietor, it is said that if the deed were void, the state having assumed to sell the land as the property of a citizen to satisfy his taxes, was precluded from asserting title as the original proprietor.

In this case the state has not sold or attempted to sell the land, nor does the defendant claim under it. The taxing officers are not vested with discretion to tax or refrain from taxing property within their respective jurisdictions. If they fail to levy taxes upon land subject to taxation, the levy may subsequently be made; if they levy taxes upon land not subject to taxation, the levy is void. They are not vested by law with power to perform any act which will estop the state from asserting title to the school lands, which it holds in trust for the benefit of all of the school children within its boundaries. This subject has been discussed and determined adversely to the defendant's contention in the following cases: *Crane v. Reeder*, 25 Mich. 303, 320; *Howard County v Bullis*, 49 Ia. 519; *Reid v. State*, 74 Ind. 252; *State v. Portsmouth Savings Bank*, 106 Ind. 435.

Upon a consideration of the entire record, we find generally for the plaintiff.

DECREE ACCORDINGLY.

FAWCETT, J., dissenting.

While I have been unable to reach the same conclusion as that reached by my associates *in re* the so-called "beer bottle" corner, I pass that point without discussion. The defense of estoppel, however, based upon the laches of the plaintiff, is in my judgment so clearly established that I cannot permit the majority opinion to go down without expressing my views upon that point.

From quite an early date, the corners of section 36 have been uncertain and the correctness of the original survey has been questioned in the neighborhood. Resurveys made by the government failed to relieve the situation of its uncertainty. The question as to whether or not the corners, as established by the original survey, were found by the surveyors making the resurveys is so uncertain that the boundary line between the lands of plaintiff and defendant has never been satisfactorily settled. As a result of the survey and resurveys, section 43 was established, and a patent issued to defendant in 1904 for the land in controversy, which he had entered in 1898. It appears from the undisputed evidence that when defendant made his homestead entry in 1898 he took possession of the land up to the boundary line as he understood and claimed it to be; that he continued in such possession for the full period of five years required by the homestead laws, and in 1904 received from the United States government a patent for the land of which he had been in possession for the prior five years, and which land is the land in controversy. As soon as the patent was issued to him, the land was, by the regular taxing officers of the state, assessed and taxed in his name as owner, and continued to be so assessed and taxed down to the commencement of the present suit. Such taxes were regularly paid by defendant. It appears, therefore, without dispute, that the defendant had been in posses-

sion of the land in controversy, under claim of ownership, for eleven years prior to the commencement of this suit, with full knowledge on the part of the state of his possession and claim of ownership under his homestead entry in 1898 and patent of 1904, and with the further knowledge on ·the part of the state that the land had, since 1904, been assessed and taxed to defendant as "section 43"; that he had regularly paid his taxes so levied, and that such taxes were annually accepted and used by the state. With knowledge of all of these facts, no attempt was ever made by the state to dispossess defendant of this land until it instituted the present suit in 1909. The mere fact that a lessee of the state may have questioned defendant's right to a portion of the land claimed by him, and one year hauled off and stacked some hay which defendant had cut thereon, cannot, in my judgment, in any manner operate to the advantage of the state, or be construed as an assertion by it of its right to the land claimed by and in the possession of defendant. Nor should the fact that defendant permitted the taking of his hay by such lessee, and thereby possibly avoided litigation over something that was probably of little value, be taken as any relinquishment by defendant of his claim. Nor is it material that, if defendant succeeds in holding the land, section 36 may be "short." The land obtained by the state under its grant from the government was "section 36," as shown by the first approved government survey, and was limited to the number of ᶜacres which it actually contained, whether that number were 640 acres or a less quantity. That the government did not at the time regard the land in controversy as a part of section 36 is evidenced by the fact of its establishment of section 43 and the issuance to defendant of a patent therefor. While I freely concede that, as against the state in the exercise of any of its governmental functions, there can be no estoppel, I am unable to see why, in a suit in equity or an action at law for the enforcement or protection of a mere property right, the state is not as

much subject to the doctrine of estoppel as is any other litigant. The authorities so hold. *State v. Lincoln Street R. Co.,* 80 Neb. 333; *United States v. Stinson,* 125 Fed. 907; *United States v. Chandler-Dunbar Water Power Co.,* 152 Fed. 25; *Walker v. United States,* 139 Fed. 409; *Bullis v. Noble,* 36 Ia. 618; *City of Peoria v. Central Nat. Bank,* 224 Ill. 43; *United States v. Willamette Valley & C. M. Wagon Road Co.,* 55 Fed. 711; Cooley, Constitutional Limitations (5th ed.) *254; *State v. Flint & P. M. R. Co.,* 89 Mich. 481; *Simplot v. City of Dubuque,* 49 Ia. 630. And this, too, without reference to the statute of limitations. *State v. City of Des Moines,* 96 Ia. 521.

It is urged by the attorney general that defendant knew that the state was leasing "this land" to Rowley and Bachelor, and that the public records at Lincoln and in Cherry county showed it. I do not think so. What those records showed, and what defendant would thereby be bound to know, was that the state had leased to those gentlemen "section 36"; but those records would not advise him that the state was claiming that *his land* was *in* section 36. He certainly would have no reason to think so from those records, when he had in his possession a patent from the United States government which showed that the land he claimed was in section 43.

How long would a similar case stand if the plaintiff were an individual or a private corporation, instead of the state? To illustrate: Smith owns a large tract of land. He donates a portion of it to an irrigation company incorporated under the laws of the state. The company digs its ditches, and has the water flowing therein, through not only the land which it receives from Smith, but also through adjoining lands which still belong to Smith. Subsequently Smith sells the adjoining land to Jones on a five-year contract, which provides, as a condition for Jones' obtaining a deed from Smith, that Jones must pay Smith $14 (the amount which defendant paid for his homestead), and actually reside upon the land for the five years specified in the contract. There is a

dispute as to the boundary line between the land donated to the irrigation company and that conveyed to Jones. Jones immediately takes possession of the land up to the boundary line as he claims it to be. He retains such occupancy of, and maintains his residence upon, the land for the full period of the five years specified in his contract with Smith. Smith thereupon executes and delivers to him a warranty deed for the land. The irrigation company immediately demands of Jones that he pay to the irrigation company a dollar a year for the upkeep of the ditch which goes through the land he is claiming to own. Jones pays the dollar a year to the irrigation company each year for five years thereafter. During all of this period of more than ten years that Jones has been in possession, the irrigation company takes no steps to dispossess him of that portion of the land which it claims is within the limits of its grant from Smith, but after the lapse of those years it brings a suit against Jones to quiet its title to and for the possession of the land in dispute. How long would the case of the irrigation company last in this court? Just long enough for us to write a short opinion dismissing its suit upon the ground that by its own gross laches it is estopped to question either the title or right of possession of Jones. The case thus outlined is in all respects a twin brother of the case decided in the majority opinion.

In *United States v. Chandler-Dunbar Water Power Co., supra* (p. 40) it is said: "Following the ancient common law maxim *'nullum tempus occurrit regi,'* it has been settled as the rule here that the United States is not affected in respect to its pursuit of remedies by mere delay or general statutes of limitation. But, when it sues in equity as a private suitor on a cause of action relating to its proprietary interests, it is held to be affected by those equities which are recognized as fundamental in controversies between private parties."

To my mind it would be an act of injustice to take this land from the defendant and give it to the state. If the

state had been prompt in the assertion of its claim in 1898, when defendant entered the land and took possession of it, and had then ousted him, he could have obtained other land by homestead entry, or have purchased the same at a price far less than that at which he could possibly obtain it now, and could have devoted his 13 years of energy and labor to the improvement of the same. I cannot give my consent to such confiscation on the part of the state.

REESE, C. J., concurs in this dissent.