STATE OF NEBRASKA, PLAINTIFF, V. WOODRUFF BALL ET AL., DEFENDANTS.

FILED MARCH 14, 1913. No. 16,050.

1. **Boundaries: EVIDENCE: SUFFICIENCY.** The additional evidence produced upon this second trial, together with the evidence taken upon the first trial, requires a finding and judgment in favor of the defendant. The finding stated in the seventh paragraph of the syllabus of the former opinion (90 Neb. 307) is contrary to the preponderance of the whole evidence.

2. **Former Opinion Modified.** Former syllabus and opinion modified so as to leave questions of laches and estoppel undetermined. Under the present condition of the evidence those questions are not necessarily involved.

ORIGINAL action by the state to quiet title to a certain tract of land. *Decree for defendant.*

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton,* for plaintiff.

*Brown, Baxter & Van Dusen, F. M. Walcott* and *Frank M. Tyrrell, contra.*

SEDGWICK, J.

This action was originally begun in this court, and upon the first trial judgment was entered in favor of the plaintiff. Afterwards, upon a showing of newly discovered evidence, a new trial was granted, and the Honorable John J. Sullivan was appointed referee to take evidence and report findings of fact and conclusions of law. The referee took a large amount of additional testimony, and filed his report, finding generally in favor of the defendant. The attorneys for the state have filed exceptions to this report, and the case has been submitted upon additional briefs and oral argument.

In the former opinion (90 Neb. 307) the issues and the principal points of the controversy are stated. It was also stated in that opinion that "the parties substantially agree that if the 'Ball corner,' located 45 chains and 48½ links west of the northeast corner of section 36, is the site of the corner established in 1882 by McElroy, the government surveyor, as the northwest corner of the section, we should find for the defendant." It was found from the evidence, as it then stood, that the "Ball corner," mentioned in the above quotation, was not shown to be the location of the corner established by the surveyor, McElroy. The additional evidence taken by the referee relates mostly to this question, and he finds that the evidence establishes the identity of the so-called "Ball corner" with the corner established by the surveyor, McElroy. The referee appears to have given unusual attention and care in the investigation of the case, and in his report he says:

"Two theories are admissible: (1) That McElroy established the Ball corner as the northwest corner of the

section; (2) that McElroy established the northwest corner a mile west of the Ball corner.

"The second theory is supported by evidence and circumstances worthy of consideration, but it is, in my judgment, completely overborne by the proofs adduced in support of the first theory. The evidence given at the first trial, plus that produced at the second trial, preponderates greatly in favor of defendant's contention, and fully satisfies me that the truth is the Ball corner was the first interior section corner established by McElroy in the 1882 survey of township 30. All the original section corners and some of the quarter-section corners on the north line of the southern tier of sections in township 30, west of the Ball corner, are now satisfactorily located by the evidence, and are shown to bear a proper relation to the Ball corner, assuming it to be the northwest corner of section 36. The corner at the bend of Snake creek, about four miles north of a point one mile west of the Ball corner, is now proved with practical certainty to be the government corner for sections 2, 3, 10 and 11. No corners have been found on the line described in the McElroy field notes running north from the southwest corner of section 36. It further appears from the testimony of old settlers that in early days the government corner five miles west of the Ball corner was understood to mark the west boundary of the township.

"These salient facts, well established, as I think, by the evidence now in the record, make a revision of the former finding with respect to the location of the northwest corner of section 36 imperative. It would not be possible to present within reasonable bounds any condensation of the great mass of evidence given at the trial that would materially aid the court in dealing with exceptions to this report. To give a just impression of its value, it would be necessary to set out an abstract of it. Perhaps I have given too much weight to some and too little to other testimony, but, as a result of it all, I feel fully convinced, in the light of the new evidence, that the court was wrong in

holding that the Ball corner was not established by Mc Elroy as the northwest corner of section 36.

"I further find that McElroy, in making the interior survey of township 30, ran a line due north from the southwest corner of section 36, 40 chains, to the edge of the Boardman marsh where a mound was erected. He did not, however, cross the marsh, but went around it, and established the Ball corner on the assumption, doubtless, that it was half a mile north of the mound erected on the south side of the marsh. From this corner he ran straight lines north and south, and thus fixed the boundaries of section 36 as a tract containing approximately 480 acres. In other words, he eliminated by error what would have been the northwest quarter of the section had it been, of statutory dimensions.

"But if the state's claim with respect to the location of the northwest corner of section 36 were conceded, the judgment should, nevertheless, in my opinion, go in favor of the defendant. To deprive him of the property in dispute under the admitted facts would, it seems to me, be altogether unconscionable. I do not see how it can be done without disregarding entirely maxims of equity which are and ought to be of universal application. The state, as a suitor in its own court, is bound by self-imposed bonds to accord to an adversary the full measure of justice which it claims for itself. It cannot, under equitable principles, demand equity without offering to do equity. Year by year, from 1904 to 1912, acting through its duly constituted agents, it collected taxes from defendant as the owner of the land in dispute and expended them for public purposes. It has never made restitution; it has never offered to make restitution. It is here asking this court, in the exercise of its equitable jurisdiction, to award to it the land patented to defendant by the general government, while all the time holding fast to the money which defendant paid it on the assumption that the property was his. It has not offered to do equity, and has, therefore, no just claim to equitable relief.

"The equitable doctrine of laches stands also in the state's way. Not only by its affirmative action in taking and using money collected from defendant as taxes, but by its long inertia as well, it has forfeited the right to invoke equitable intervention in its behalf. Not only has defendant expended money and labor upon the property in the justifiable belief that it was his, but with the lapse of time and the death, dispersion and loss of memory of witnesses, the difficulties of establishing his claim of ownership have been very materially enhanced. His plight is far worse now than it was at the time when the state ought, in the exercise of reasonable diligence, to have commenced this suit. I do not think the fact that school lands are, by the constitution, set apart for educational uses absolves the state, wherever they are involved, from the obligation of equitable doctrines. The state has a proprietary interest in school lands and is bound to devote them to a specific purpose—one of the many purposes which it is organized to carry into execution. It is true that the state has declared itself to be a trustee for school lands, fines, penalties and forfeitures. This means merely that it has resolved to dedicate certain of its own property and funds to educational uses; but, conceding that the court is here dealing with a technical trust, that fact cannot influence the decision. I have never understood that the existence of a trust of any character was sufficient to free either the trustee, the *cestui que trust,* or the chancellor from the obligations imposed by sound morality.

"My conclusion upon the whole case is that the petition should be dismissed and all costs taxed to the state."

The case has been thoroughly briefed and ably presented, both on the part of the state and on the part of the defendant, and the evidence as to this location of this section corner by the surveyor, McElroy, in the original survey has been thoroughly analyzed and carefully presented. The question is not without difficulty, and we realize the force of the suggestion of the referee that both

theories are worthy of discussion and careful considera-
tion. We think, however, the conclusion of the referee
upon this point is supported by the preponderance of the
evidence. Having reached this conclusion, we do not
find it necessary to consider and discuss the questions sug-
gested as to estoppel and laches, and desire to modify our
former opinion in that respect so far as to leave those
questions undetermined.

Upon the main question above stated, the report of the
referee is approved and confirmed, and judgment entered
for the defendant accordingly.

DECREE FOR DEFENDANT.

ROSE, J., dissenting.

After a full hearing and a careful consideration of the
evidence, without the aid of a referee, a decree in favor of
plaintiff was entered at a former term. *State v. Ball,* 90
Neb. 307. In my judgment the findings on the first trial
were correct. I do not agree with the referee and the
majority that the newly discovered evidence requires a
different judgment. The exceptions should be sustained.
I also dissent from that part of the majority opinion open-
ing the questions of estoppel and laches for future con-
sideration. The doctrine that petty administrative offi-
cers by means of unauthorized acts can dispose of state
school land in violation of provisions of the constitution
should never be sanctioned. If the constitutional and
statutory system of holding and controlling school land
may be substituted for unauthorized acts of taxing offi-
cers, who can tell whether any land belongs to the per-
manent school funds? Is morality in this respect to be
the test of the rights of the state as intimated by the
referee? Are ideas of unwritten, indefinable moral obli-
gations, floating in the inner consciousness of judges, and
arising from conflicting testimony of litigants, to be the
means of depriving the sovereign of school land? Is tres-
pass to be substituted for law? Unless there is some idea

that constitutional government administered by written statutes is to be abandoned in a material respect, the questions of estoppel and laches, as announced in the former opinion, should not be open to further controversy.

Estoppel and laches are properly applied to rational persons who have the power to contract and to act in all their dealings as free agents, but those doctrines have no application to a sovereign having only power to act through departments and officers whose duties and powers are limited and defined by written statutes. Individuals are not wronged by applying to the state a rule which does not apply to them, because the powers, duties and acts of officers are shown by public records available to all. Courts ought not to assume in advance that the state will be immoral in its administrative dealings in regard to its school land. The legislature, if asked, will enact proper laws to correct any wrong or to appropriate money to pay any proper claim. In the meantime the attorney general should assert the rights of the state as they exist under present institutions. Any other view disregards the philosophy on which constitutional government administered by means of written statutes is founded. I am therefore compelled to dissent from that part of the majority opinion opening the questions of estoppel and laches.

Barnes, J., concurs in dissent.