# Richmond

W. F. DANIEL V. FLORIDA INDUSTRIAL COMPANY.

November 17, 1932.

Present, Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Henry Roberts,* for the plaintiff in error.

*L'Engle & Shands* and *Robert L. Pennington,* for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action, instituted by a notice of motion for judgment, brought by Florida Industrial Company, a corporation, against W. F. Daniel to recover the balance due on three notes for $8,797.19 each, which were given that company by Daniel for the deferred installments of the purchase price of fractional section 1, township 43 south, range 29 east, and lots three and four in fractional section 6, township 43 south, range 29 east, in Hendry county, Florida, which were conveyed by it to Daniel by a deed dated September 14, 1925.

Daniel's defense is a plea of set-off in which he alleges that the land shown on the diagram, which we have inserted, as the area K X Y C, containing seventy-eight acres, is in section 1, township 43 south, range 29 east; that Florida Industrial Company had lost title to this seventy-eight acres through the adverse possession of other persons;

and that he is entitled to have the value thereof at the time of his purchase of section 1 set-off against the demand of the plaintiff.

Space forbids the insertion of a plat covering all the territory to which reference is made in the evidence; and

the diagram inserted shows in their entirety only sections 1 and 12. On this diagram the section lines called for by the Government map and field notes are shown as solid lines. The north and south lines and the east and west lines, shown as broken lines, denote lines which the defendant claims were run on the ground by the surveyor for section lines, though the locations thereof do not accord with his field notes.

The reply of Florida Industrial Company is that the area K X Y C lies in section 12, not in section 1, and was not conveyed, or intended to be conveyed, in the deed from it to Daniel.

Florida Industrial Company introduced in evidence the three notes sued upon, which had endorsed thereon certain credits for sums paid to it by Daniel, the purchase money mortgage given to it by Daniel to secure the payment of these notes, and a written agreement, dated September 14, 1926, between it and Daniel by which the time for the payment of the balance due on the first note was extended to September 14, 1929. It then rested.

All other evidence was introduced by Daniel, or brought out on the cross-examination of witnesses introduced by him, or consisted of depositions, which though taken by Florida Industrial Company, were read in evidence by Daniel.

At the conclusion of the evidence for the defendant the court sustained the motion of the plaintiff to strike out all of Daniel's evidence. The ground of this motion was, in effect, that as a matter of law it was insufficient to sustain a verdict finding that the land within the area K X Y C is included in the land conveyed by Florida Industrial Company to Daniel.

The jury returned a verdict for the plaintiff for an amount which is correct, unless the defendant is entitled to the set-off pleaded by him in his plea above mentioned. The court entered judgment on this verdict, to which judgment the defendant has been granted a writ of error.

The primary assignment of error is that the court erred in sustaining the motion to strike out the defendant's evidence. If the court was correct in this ruling, the other assignments of error are without point.

These Florida lands were a part of the public lands of the United States, and were subdivided and disposed of by it to private persons. The United States statutes prescribing rules for surveying and for ascertaining the boundaries and contents of subdivisions of the public lands have remained unchanged in any particular here material from long prior to 1872 to the present time. See sections 2395-2396, Revised Statutes U. S. 1878; U. S. Code Ann. (1928), Title 43, Public Lands, sections 751-752. The pertinent parts of sections 751-752, U. S. C. A., Title 43, Public Lands, are quoted in the footnote.[1] We note below the rules of law which have been laid down by the courts relating to what constitute Government subdivisions of the public lands, and to ascertaining the boundaries thereof.

■ A survey of the public lands of the United States does not describe boundaries, it creates them. *Cox* v. *Hart* (Cal. 1922), 260 U. S. 427, 43 S. Ct. 154, 67 L. Ed. 332. A "Government section" or other "Government" subdivision is the land lying within the lines of that section or subdivision as surveyed and marked upon the ground by the

---

[1]Section 751, U. S. C. A., Title 43, Public Lands, paragraphs 1, 3, and 5:

"The public lands shall be divided by north and south lines run according to the true meridian, and by others crossing them at right angles, so as to form townships of six miles square, unless where the line of an Indian reservation, or of tracts of land surveyed or patented prior to May 18, 1796, or the course of navigable rivers, may render this impracticable; and in that case this rule must be departed from no further than such particular circumstances require.

"Third. The township shall be subdivided into sections, containing, as nearly as may be, six hundred and forty acres each, by running through the same, each way, parallel lines at the end of every two miles; and by making a corner on each of such lines, at the end of every mile. The sections shall be numbered respectively, beginning with the number one in the northeast section and proceeding west and east alternately through the township with progressive numbers till the thirty-six be completed.

government surveyor. This is true, even though due to some mistake made by him the surveyor ran and marked the lines on the ground otherwise than as was required by the rules and regulations of the government, or as called for in his field notes. If the point at which a section corner was placed by the government surveyor or the line marked by him as a section line is satisfactorily established, it is conclusive as to the location of the corner or line, though the location of the corner or line does not accord with that corner or line as shown on the government map of the subdivision, or with that called for by the field notes of the surveyor who made the survey on which the government map is based. *Watrous* v. *Morrison,* 33 Fla. 261, 14 So. 805, 39 Am. St. Rep. 139; *Kirch* v. *Persinger,* 87 Fla. 364, 100 So. 166; *Lawler* v. *Rice & Goodhue Counties,* 147 Minn. 234, 178 N. W. 317, 180 N. W. 37; *Nesselrode* v. *Parrish,* 59 Iowa 570, 13 N. W. 746; *Climer* v. *Wallace,* 28 Mo. 556, 75 Am. Dec. 135; *Hess* v. *Meyer,* 73 Mich. 259, 41 N. W. 422; *Puget Mill Co.* v. *North Seattle Imp. Co.,* 120 Wash. 198, 206 Pac. 954; *Beardsley* v. *Crane,* 52 Minn. 537, 54 N. W. 740; *Anderson* v. *Johanesen,* 155 Minn. 485, 193 N. W. 730; *Galbraith* v. *Parker,* 17 Ariz. 369, 153 Pac. 283, on rehearing *Ivy* v. *Parker,* 18 Ariz. 503, 163 Pac. 258; *State* v. *Ball,* 90 Neb. 307, 133 N. W. 412; *Ogilvie* v. *Copeland,* 145 Ill. 98,

"Fifth. Where the exterior lines of the townships which may be subdivided into sections or half-sections exceed, or do not extend six miles, the excess of deficiency shall be specially noted, and added to or deducted from the western and northern ranges of sections or half-sections in such township, according as the error may be in running the lines from east to west, or from north to south; the sections and half-sections bounded on the northern and western lines of such townships shall be sold as containing only the quantity expressed in the returns and plats respectively, and all others as containing the complete legal quantity."

Section 752, U. S. C. A., Title 43, Public Lands (omitting par. 3):

"The boundaries and contents of the several sections, half-sections, and quarter-sections of the public lands shall be ascertained in conformity with the following principles:

"First. All the corners marked in the surveys, returned by the Field Surveying Service, shall be established as the proper corners of sections, or subdivisions of sections, which they were intended to

33 N. E. 1085; *Yolo County* v. *Nolan*, 144 Cal. 445, 77 Pac. 1006.

"In the sale of lands in sections, or subdivisions thereof, including lots, according to the government survey, the survey as actually made controls. *Miller* v. *White*, 23 Fla. 301, 2 So. 614; *Liddon* v. *Hodnett*, 22 Fla. 442. It is the survey as it was actually run on the ground that governs, if the monuments, corners or lines actually established can be located or proved. Courses and distances yield to such corners and lines, so long as the latter can be located, and for the reason that the latter are the fact or truth of the survey as it was actually made while the former are but descriptions of the act done, and when inaccurate they cannot change the fact." *Watrous* v. *Morrison*, 33 Fla. 261, 14 So. 805, 807, 39 Am. St. Rep. 139.

But the field notes and government plats made by the government surveyors at the time public lands were originally surveyed are presumed to be correct; and they are determinative of the true location on the ground of the corners and lines therein called for, until it is shown by clear and convincing evidence that the corner or line in question was in fact established on the ground by the government surveyor at a place other than that called for by the field notes and plat of the original survey. Especially is this true where, as in the case at bar, the field notes call for

---

designate; and the corners of half and quarter sections, not marked on the surveys, shall be placed as nearly as possible equidistant from two corners which stand on the same line.

"Second. The boundary lines, actually run and marked in the surveys returned by the Field Surveying Service, shall be established as the proper boundary lines of the sections, or subdivisions, for which they were intended, and the length of such lines, as returned, shall be held and considered as the true length thereof. And the boundary lines which have not been actually run and marked shall be ascertained, by running straight lines from the established corners to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary lines shall be ascertained by running from the established corners due north and south or east and west lines, as the case may be, to the watercourse, Indian boundary line, or other external boundary of such fractional township."

the location of the corners and lines substantially as the law directs that they shall be established. *Langle* v. *Brauch,* 193 Iowa 140, 185 N. W. 28; 9 C. J. (Boundaries), page 215, section 130 *et seq.*

In a deed between private parties where the land conveyed was a part of the public lands of the United States and is described and designated only as a certain section, or other government subdivision in a designated township and range, without any other description, it means that "government section" or other "government subdivision," and in determining the lines of the land thereby conveyed the same rules apply that apply in determining, as against the government, the lines of a section, or subdivision thereof, which has been conveyed by it. The lines of the subdivision as marked on the ground at the time of the original government survey, when satisfactorily established, determine the lines of the land conveyed, whether they accord with the government map or the field notes of the survey or not. See cases above cited; *Kelsey* v. *Lake Childs Co.,* 93 Fla. 743, 112 So. 887; *Town* v. *Greer,* 53 Wash. 350, 102 Pac. 239; *Trinwith* v. *Smith,* 42 Or. 239, 70 Pac. 816; *Fellows* v. *Willett,* 98 Okla. 248, 224 Pac. 298; *Desha* v. *Erwin,* 168 Ark. 555, 270 S. W. 965. As between the parties to a deed this rule is subject to some exceptions, as for instance, where it is shown that there was a mutual mistake of the parties as to the location of the lines of the government subdivision, and that it was their mutual intention that the deed should convey a definite piece of land. *Town* v. *Greer, supra.* But the case at bar does not fall within such exceptions.

The official government map of township 43 south, range 29 east, shows section 1 as a fractional section bounded by four straight lines. Its north line is a part of the north line of the township, but neither its course nor length is noted on the map. Its east line is a part of the east line of the township and is noted as being 23.85 chains long. Its south line runs from a point on the east line of the township

(corner to section 12) S 89° 47′ W 80.17 chains, and is a part of a straight line which is shown as the northern boundary of full sections 12, 11, 10 and 9. Its west line is 25.53 chains long, and is the northern segment of a straight north and south line running from the southern to the northern line of the township, which is the western boundary of full sections 36, 25, 24, 13, 12 and of fractional section 1. The section is divided on the map into four lots by north and south lines, and the aggregate of the acreages noted as being contained in these four lots is 197.52 acres.

The fact that the government map shows that the northern boundary of section 9 and the southern boundary of section 1 are parts of the same straight line, running substantially due east and west, is the key to the way this controversy arose.

The courthouse square at La Belle, the county seat of Hendry county, is in section 9, and in that community the northwest corner of the square is reputed to be the northwest corner of section 9. From the northwest corner of the courthouse square State highway No. 25 runs for two miles on what appears to be a straight line due east. It then bends to the north through a small, but apparent, angle, and runs on a straight line along the new course for a little more than a mile to the point marked A on the diagram heretofore inserted. At this point it is deflected to what is substantially a due east line and continued eastward along the courses shown on the diagram.

When Daniel was considering the purchase of section 1, he procured maps of the township which purported to be copies of the official government map. He learned that State highway No. 25 was supposed to run along the northern line of section 9, and driving along the highway he noted the bends in it at the points approximately two and three miles from La Belle. He observed that, if the line along which the highway ran for two miles east of the courthouse at La Belle was projected eastward, it would pass some distance south of the line which runs from A to B on the dia-

gram. From this information he concluded that the line of the highway from A to B ran through section 1, and at least several hundred feet north of the south line of the section. He purchased the land in this belief, and according to his testimony, the fact that he thought the section included the land south of the road very materially influenced his decision to purchase section 1. But, there is no evidence which shows, or tends to show, that Florida Industrial Company, or any of its agents, was in any way responsible for Daniel's having thought that this was true, or had any reason to believe that he thought so.

John H. Caldwell, Sr., negotiated the purchase here in question for Daniel; but the record is silent as to what took place in these negotiations other than that Caldwell received a receipt, dated May 22, 1925, from the agent representing Florida Industrial Company, which reads in part as follows:

"Received of John H. Caldwell, draft in the amount of $1,800.00 as earnest money and binder on the following described lands located in Hendry county, Florida: Lots 1, 2, 3 and 4, section 1, township forty-three south, range twenty-nine east; also lots 3 and 4, section six, township forty-three south, range thirty east, containing 281½ acres according to government survey. Purchase price $125.00 per A."

The sale was not closed by the delivery of a deed until in the fall of 1925. The deed delivered to and accepted by Daniel, which is dated September 14, 1925, contains general warranty of title and the usual modern covenants, and describes the lands conveyed as follows:

"IN TOWNSHIP 43 SOUTH, RANGE 29 EAST:

"Section 1: Government lots Nos. 1, 2, 3 and 4, constituting entire fractional section.

"IN TOWNSHIP 43 SOUTH, RANGE 30 EAST:

"Section 6: Government lots Nos. 3 and 4, constituting entire fractional west half of section."

The consideration mentioned in the deed is "ten dollars and other good and valuable considerations;" but the actual

consideration was $35,188.76, the deferred installments of which were evidenced by the three notes here sued upon. Daniel, John H. Caldwell, Sr., and Jos. A. Caldwell all testify that the consideration was figured by taking the acreage conveyed as 281½ acres and the purchase price as $125 per acre.

As has been before stated, the government map notes the acreage in section 1, township 43 south, range 29 east, as being 197.52 acres; and it appears from the record that lots 3 and 4 in section 6, township 43 south, range 30 east, contain, or are supposed to contain, in the aggregate eighty-four acres. The total of these two acreages is substantially 281½ acres.

Soon after Daniel received his deed he heard that the land abutting on the south side of State highway No. 25 from about K to B on the diagram was claimed by some other person, but he made no investigation of the matter until after this suit was brought in January, 1931. He then had an investigation made and ascertained that Mrs. Carrie Byrd Shealy and Mrs. Susan G. Hutchinson and her grantee, Mrs. Lee, were claiming to own all the land lying adjacent to and south of the line A C shown on the diagram; and that they claimed under patents issued by the United States for the northwest quarter and the southwest quarter of section 12, township 43 south, range 29 east, which had been issued on homestead entries made in 1909 and 1910.

He then had Henry S. Gove, a civil engineer, to make a survey of the eastern tier of sections in township 43 south, range 29 east, for the purpose of locating the south line of section 1 as it had been run on the ground at the time of the original survey. It is chiefly upon his testimony that Daniel relies to support his contention that the true south line of section 1 is the line X Y shown on the diagram.

Gove introduced with his testimony the government map above mentioned, the field notes of W. L. Apthorp who in 1872 surveyed and established for the government the southern and eastern lines of the township and set the corner

posts thereon for the sections bounded thereby, and the field notes of Samuel Hamblin, the government surveyor who in 1872 surveyed the inside section lines of the township and set thereon the corner posts for the sections and quarter sections. His testimony with reference to the survey which he made for Daniel presents two phases.

The first phase relates to the reproduction on the ground of the eastern tier of sections in the township according to the calls of the field notes of Apthorp and Hamblin, with which the government map accords.

The second phase of his testimony relates to evidence found by him on the ground, upon which he based the opinion expressed by him that Hamblin did not run the west and south lines of section 1 in accordance with their locations as called for by his field notes, and that he actually ran the west line of the section 417 feet east of the line called for by his field notes, and the south line 711 feet further south than called for by his field notes. That is, that the true west and south lines of the section as actually run by Hamblin on the ground are the lines X F and X Y shown on the diagram.

When Apthorp made his survey the west line of township 43 south, range 29 east, had been theretofore surveyed and the southwest corner of the township established. He ran the east line of township 44 south, range 29 east, and set a corner post for the corner between townships 44 and 43, or as he expressed it: "Set post corner TP. 43 & 44 Rgs. 29 & 30 from which a pine bears N 38 deg. E 23 lks., from which a pine bears N 45 deg. W 5 lks., from which a pine bears S 20 deg. W 41 lks., from which a pine bears S 12 deg. E 87 lks." This point we shall call M.

From this point he ran west on a "random" or trial line for the south line of township 43. This trial line intersected the west boundary of the township six chains north of the corner theretofore established as the southwest corner of the township. So he moved down to the corner which had theretofore been established as the southwest corner of the

township, and ran a "true" line between the corners established as the southwestern and the southeastern corners thereof, setting posts for the section corners as he went. His notes on this line say that at eighty chains from the southeast corner of the township he "set post corner sections 1, 2, 35 and 36 from which a pine bears N 11 deg. E 50 lks., a pine bears S 89 deg. W 47 lks., no trees convenient in sections 1 and 35." This point we shall call N. He ran thence to the southeast corner which he had established, and from thence ran north along the east line of the township, setting posts for the section and quarter-sections as he went. Omitting the descriptive matter given between the mile posts, except his calls for quarter-section corners which were positively identified by the witness Cove, his notes read as follows:

"Thence north on east boundary sec. 36 T 43 R 29 S & E
    "First Mile.

"(M 1)    80:00 set post corner sections 25, 30, 31, and 36  No bearing trees

    "Second Mile.  North on east boundary section 25

"(M 2)    80:00 set post corner sections 19, 24, 25, 30 from which
    A pine bears N 78 deg. E 27 lks.
    A pine bears S 62 deg. W 75 lks.
    A pine bears S 78 deg. E 34 lks.
    No tree convenient in section 24

    "Third Mile.  North on east bdry. section 24.

"(M 2½)    40:00 set ½ mi. post from which
    A pine bears N 6 deg. E 18 lks.
    A pine bears N 48 deg. W 20 lks.

"(M 3)    80:00 set post in edge of road to Ft. Thompson N. W. corner sections 13, 18, 19 and 24 from which
    A pine bears N 79 deg. E 84 lks.

A pine bears N 30 deg. W 98 lks.
A pine bears S 51 deg. W 107 lks.
A pine bears S 44 deg. E 47 lks.

"Fourth Mile.   North on east bdry. section 13

"(M 3½)  40:00 set ½ mile post from which
A pine bears N 5½ deg. E 20 lks.
A pine bears N 77 deg. W 30 lks.

"(M 4)  80:00 set post corner sections 7, 12, 13 and 18 from which
A pine bears N 2 deg. E 77 lks.
A pine bears N 56 deg. W 48 lks.
A pine bears S 64 deg. E 98 lks.
No tree convenient in section 13

"Fifth Mile.   North on east boundary section 12.
40:00 set ½ mi. post from which
A pine bears N 22 deg. W 17 lks.
No tree convenient in section 7

"(M 5)  80:00 set post corner sections 1, 6, 7 and 12 from which
A pine bears N 60 deg. E 19 lks.
A pine bears N 48 deg. W 12 lks.
A pine bears S 47 deg. W 36 lks.
A pine bears S 4 deg. E 37 lks.

"Sixth Mile.   North on east boundary section 1.
23.85 intersect Jacksons line, south boundary section 36 T 42 S; R 29 E 24; 75 ch. west of his post the SE corner of said Tp.
Set post at intersection from which a pine bears
South 20 lks.   No other trees convenient."

The notations M, M 1, M 2, etc. in the left-hand margin are not parts of Apthorp's notes, but are placed by us for purposes of reference.

Gove testifies that the point N, the corner to sections 35 and 36, is a definitely known point. At this point he found a government stake, or post, with the proper government marks on it for this corner; and he was able also to verify this post by one of the two witness trees called for by Apthorp and the stub of the other. He testifies that in his whole survey this was the only stake he found which he would say was an original government stake, the others were, "I would say possibly twenty or twenty-five years old, possibly more." He cut into the witness tree which is standing, and found at fifty-eight annual rings from its outer surface evidence that it had been blazed.

When, beginning at N, Gove retraced the remainder of the south line and the east line of the township in accordance with the calls of Apthorp's notes, he found and positively identified the corners established by Apthorp at points M, M 1, M 2, M 2½, M 3, M 3½, M 4 and M 5. He identified them by the witness trees called for by Apthorp, or the stumps thereof. They were all located on the true township line within a fraction of a chain of the distances from each other for which Apthorp calls in his field notes. The point (M 5) at which Apthorp set the post for the corner to sections 1 and 12 is the point C shown on the diagram, and was positively identified by him by finding one of the witness trees and the stumps of two others called for by Apthorp. He cut into the witness tree that was standing, an 18 inch pine, and at fifty-seven annual rings from its outer surface found evidence that it had been blazed.

Hamblin began his subdivision of the township at N, the corner of sections 35 and 36 on the south line of the township. Omitting certain calls along the lines of sections 36 and 25, which are not here material, his notes read:

"From the corner to sections 1, 2, 35 and 36 on the south boundary of this township I run north between sections 35 and 36.

"80:00 set post for corner to sections 25, 26, 35 and 36 from which

A pine 14 in. diam. bears N 16 deg. W 50 lks.
A pine 15 in. diam. bears S 22 deg. W 43 lks.
A pine 13 in. diam. bears S 33 deg. E 102 lks.
A pine 10 in. diam. bears N 81 deg. E 71 lks.

"East on a random line between sections 35 and 36
80:23 intersected east boundary of township 21 lks.
North of the post corner to sections 25 and 36 from which
I ran N 89 deg. 51 min. W on true line between sections
   23 and 36.
40:12 set post for ¼ section corner
80:23 to corner sections 25 and 26-35 and 36

"North between sections 25 and 26
80:00 set post for corner sections 23, 24, 25, 26 from
   which
A pine 13 in. diam. bears S 13 deg. W 29 lks.
A pine 15 in. diam. bears N 40 deg. W 92 lks.
A pine 20 in. diam. bears S 74 deg. E 98 lks.
3d. rate pine and palmetto land.

"East on random line between sections 24 and 25
40:00 set post for temp. ¼ section corner
80:19 intersected east boundary of township at post cor-
   ner to sections 24 and 25 from which I run west on
   true line between sections 24 and 25.
40:09 set post for ¼ section corner from which
A pine 7 in. in diam. bears N 75 deg. W 87 lks.
A pine 10 in. in diam. bears S 32 deg. E 92 lks.
80:19 the corner sections 23-24-25-26
3d. rate pine and palmetto.

"North between sections 23 and 24
32:00 to grass pond
40:00 set post in pond for ¼ section corner.  Could not
   raise mound.
46:00 cross pond to pine
80:00 set post for corner to sections 13, 14, 23 and 24
   from which

A pine 10 in. diam. bears N 72 deg. W 43 lks.
A pine 8 in. diam. bears S 15 deg. W 80 lks.
A pine 10 in. diam. bears S 44 deg. E 31 lks.
A pine 10 in. diam. bears N 34 deg. E 42 lks.
3d. rate pine and palmetto land

"East on random line between sections 13 and 24
4:00 to prairie
6:00 to pine land
15:00 to prairie
18:00 to scrub and palmetto
32:00 to pine
40:00 set post for temp. 1/4 section corner
80:15 intersected east boundary of township 23 lks.
South of post corner to sections 13 and 24 from which I
    run
S 89 deg. 50 min. W on true line between sections 13 and
    24
40:07 set post for 1/4 section corner, from which
A pine 8 in. diam. bears N 66 deg. E 28 lks.
A pine 10 in. diam. bears S 4 deg. E 10 lks.
80:15 to corner sections 13, 14, 23 and 24
3d. rate pine and palmetto

"North between sections 13 and 14
40:00 set post for 1/4 section corner from which
A pine 10 in. diam. bears N 45 deg. W 66 lks.
A pine 10 in. diam. bears S 82 deg. E 100 lks.
80:00 set post in edge of wet prairie for the corner to
    sections 11, 12, 13 and 14 from which
A pine 10 in. diam. bears N 35 deg. W 56 lks.
A pine 10 in. diam. bears S 51 deg. W 70 lks.
A pine 8 in. diam. bears S 64 deg. E 65 lks.
A pine 6 in. diam. bears N 24 deg. E 30 lks.
3d. rate pine and palmetto land.

"East on random line between sections 12 and 13
3:00 leave wet prairie to pine land

27:00 to prairie

40:00 set post for temp. ¼ section corner

57:00 cross to pine land

79:78 intersected the east boundary of the township 42 links south of the post corner to sections 12 and 13 from which corner I run S 89 deg. 42 min. west on true line between sections 12 and 13

39:89 set post for ¼ section corner in mud pits 10 lks. east and west

79:78 the corner to sections 11, 12, 13 and 14

3d. rate pine and wet prairie land.

"North between sections 11 and 12

9:00 cross wet prairie to pine and palmetto

40:00 set ¼ section post from which

A pine 15 in. diam. bears N 88 deg. W 82 lks.

A pine 11 in. diam. bears N 32 deg. E 27 lks.

66:00 leave pine and palmetto to open bottom land

80:00 set post corner to sections 1, 2, 11 and 12 from which

A cabbage bears S 32 deg. W 123 lks.

A cabbage bears S 29 deg. E 128 lks.

A cabbage bears N 51 deg. E 138 lks.

2nd. rate pine and palmetto land—Jan. 29, 1873.

"East on random line between sections 1 and 12

7:00 to pine and scattering cabbage

40:00 set post for temp. ¼ section corner

80:17 intersected east boundary of township 30 lks. south of the post corner to sections 1 and 12 from which I run S 89 deg. 47 min. W. on true line between sections 1 and 12.

40:08 set post for ¼ section corner from which

A pine 10 in. diam. bears N 47 deg. W 53 lks.

A pine 9 in. diam. bears S 28 deg. E 78 lks.

80:17 the corner⁻sections 1, 2, 11 and 12

2nd rate pine and cabbage land

"Knowing that I shall intersect the south boundary of

township 42 S of R 29 E in less than 80 chains I run north on a true line between sections 1 and 2

"25:53 intersected the south boundary of T 42 S R 29 E and set post for corner to fractional sections 1 and 2 in mound Pitts ten links east and west.

"1st rate rich bottom land subject to overflow."

It is plain that the calls in Hamblin's notes for the "post corner to sections 25 and 26," the "post corner to sections 13 and 24," the "post corner to sections 12 and 13," and "the post corner to sections 1 and 12" were intended by Hamblin as calls for the respective corner posts set for these section corners by Apthorp the year before.

Gove began at the corner of sections 36 and 35 on the south line of the township (point N), and reproduced on the ground the section lines of the eastern tier of sections in accordance with the calls of Hamblin's field notes in the same order in which Hamblin says he ran them. He testifies that when he did so, he found that the south line of section 1 ran from the point C on the eastern line of the township to B and thence along State highway No. 25 from B to H; and that the point C is the known and positively identified point (M 5) at which Apthorp set a post for the corner to sections 1 and 12. He also testifies that when the lines of section 1 are run in accordance with Hamblin's field notes, it contains substantially 197½ acres.

The depositions of E. E. Goodno, Mrs. Carrie Byrd Shealy, Drew Hampton and S. L. Stewart were taken by the plaintiff, but were read in evidence by the defendant.

Goodno testified that he had lived at Fort Thompson, which is about two and one-half miles from section 1, for twenty-eight years, and had for twenty-eight years owned sections 2 and 11 in township 43, and also the section in the next township which lies east of section 12 of township 43. When he purchased these lands there was a post at the northwest corner of section 12. It was "about three feet high and six inches square; the top was hewed." * * *

"It was in an open place. There was saw palmetto and chaparral around it, but it was an open place I would say sixty or seventy feet across." * * * "Everybody knew that corner because it was right side of a cow path where we were through every day nearly." Soon after he bought sections 11 and 2 he had them surveyed by Mr. Hampton, Drew Hampton's father, and he located that stake as the northwest corner of section 12. It was there before Hampton made this survey and he left it right where it was. That stake was "in the center of the road," State highway No. 25. Mr. Stewart buried the stake there. "It is everybody's belief and understanding that that (State highway No. 25) is the true line, everybody in the country."

Mrs. Carrie Byrd Shealy is the widow of James M. Byrd, who made a homestead entry on the northwest one-fourth of section 12 in 1909, and the person who secured a patent therefor in 1917. James M. Byrd died in 1914. She testifies that Mr. Hampton, who was county surveyor, made a survey of this quarter section for her husband soon after he made his homestead entry, and pointed out to her the section corner—"The northwest corner post was shown to me right where the hard road is now." At that time there was only a county road along there. She and her husband were then living in a house he had built which was located "within a few feet of the north line, the northwest corner of that tract of land." This house was standing when she moved away from the land about eight or ten years before her deposition was taken, but is not the house that is there now. At one time she had a fence on the road that ran along her north line, which was part of a fence enclosing about fifteen acres. A part of this fence along the road was there when she moved away from the land.

Drew Hampton, a civil engineer, who is thirty-six years of age, and has done much surveying in this county and in this township, testifies that when he was a boy he helped his father survey for Mr. E. E. Goodno, in 1909 or 1910, a road from La Belle eastward beyond the east line of town-

ship 43 south, range 29 east. Before that time his father had made a survey of the northwest one-fourth of section 12 for James M. Byrd. What is now State highway No. 25 runs along the line of the road surveyed by them for Goodno. At that time there was a government stake in place for the northwest corner of section 12. "It was a wood stake, a lightwood stake, a square stake" and had "government scribe marks on it." This corner stake was located "about the center of the road" as it now exists. He and his father followed out the north line of section 12 and found a line of blazed trees all the way across. This line corresponded with the stake mentioned, and "extended along the road, right on out, prolonged." The blazed marks on the trees had the appearance of being original government marks. Mr. Goodno built the first road along this line. In 1917, he (Drew Hampton) helped Stewart resurvey this road as a county road, and "we ran right along by that corner."

S. L. Stewart was county engineer of Lee county from about 1916 to 1923. When Hendry county was cut off from Lee in 1923 he became county engineer for Hendry county. In 1916 or 1917 he surveyed for Lee county what is now State highway No. 25 from what is now the west line of Hendry county to the east line of the county. He began at the west end and worked east. He testifies in part as follows: When, in 1916 or 1917, he ran the survey for what is now State highway No. 25, he found at the northwest corner of section 12 "an old stake which is probably now buried in the middle of that road. We first ran the road and took the section line for the center of our road, and when we found the stake we were going to put the grades down and drove that stake in the ground and set offset stakes twenty-five feet on each side." There was no road at that time east of that stake. "It was one of these old fat lightered stakes. I don't remember the marks on it, but I do know that we had no doubt about it being the government corner." For the purpose of checking the line

between sections 1 and 12 he "went through and found the northwest corner" of section 1. From this stake he ran the road along the south line of section 1 for something less than half a mile and then turned it northeast to get on the north line of the township. The location of State highway No. 25 is the same as the location of the road run by him in 1916 or 1917.

It also appears from the evidence that Mrs. Hutchinson and Mrs. Lee have occupied a house built a short distance east of the point B and less than 300 feet south of the line B C for many years, and that along part of the line B C there is and has been for some years a fence which encloses Mrs. Lee's premises.

None of these witnesses specifically fixes the exact point along the road at which the stake to which they refer as the northwest corner of section 12 stood; but the inference to be drawn from their testimony is that it stood about at the point A, at which the road makes a bend.

The testimony of Gove, John H. Caldwell, Jr., Hampton and Stewart establishes the following facts: The north lines of sections 9, 10 and 11, which are shown on the government map as lying in the same north and south tier of sections as section 12, have been generally accepted for many years as running along a line which lies south of the east and west line called for in Hamblin's field notes as the north line of section 12. The road shown near the bottom of the diagram, running from east of S to R, is supposed to run along the south line of section 11; and someone at some time has marked as the south line of section 12 a line which corresponds with the line A R. This line runs 669 feet south of the line called for in Hamblin's notes as the south line of section 12.

Gove also testifies that at 80.50 chains south of the line just mentioned as having been marked for the south line of section 12, he found a line which at some time had been marked by somebody as the north line of section 13, and that the west end of this line is 581 feet and the east end

of it 514 feet south of the line called for in Hamblin's notes as the south line of section 13.

Drew Hampton explains the fact that the east and west section lines of sections 9, 10 and 11, and section 14 have been run on lines lying approximately 660 feet south of the lines called for by Hamblin's notes as the corresponding lines of sections 12 and 13 in this way. The east line of township 43 south, range 29 east, as established by Apthorp has no excess length in it, but the west line of the township from the Caloosahatchee river to the corner originally established for its southwest corner is 660 feet longer than is called for by the field notes. The western line of section 9 (in which La Belle is situated) is less than two miles from the west line of the township, and four miles from the eastern line of the township, and because of this fact the lines of section 9 have been run from the west line of the township instead of from the east line. This has resulted in their being run 660 feet further south than lines run from the mile posts set by Apthorp on the east line of the township. He accounts in the same way for the location of the lines of sections 10, 11 and 14 south of the corresponding lines of section 12. He further testifies that the chain used for making these surveys in 1872-73 was a chain 660 feet (ten chains) long, and that it was not uncommon for them to "drop" a chain in keeping a count of the distance run. His testimony as to the excess length of the western line of the township is nowhere denied.

It is also to be noted in this connection that Apthorp in his field notes for the survey of the south line of the township states that when he began at the southeast corner of the township and ran west on a trial line for the south line of the township he intersected the west line of the township six chains north of the corner theretofore established for its southwest corner. Under paragraph 5 of section 751, U. S. C. A., Title 43, Public Lands, heretofore quoted in footnote 1, if there was an excess in the length of the western line of the township, the surveyor making

the subdivision thereof was required to so subdivide the township into sections so as to throw this excess into the west line of the northwest section of the township. If this was done, it necessarily resulted in the south line of the northern tier of sections being a broken line, unless there was a corresponding excess in the length of the eastern line, which there was not.

We now come to the evidence upon which Gove based his opinion that Hamblin actually ran the south line of section 1 711 feet farther south and its west line 410 feet farther east than his field notes call for.

When he started his investigation, Mr. John H. Caldwell, Sr., took him to the point R on the diagram and showed him the bend in the road there as the reputed southwest corner of section 12. Assuming this to be the corner, he ran a line S 0° 54 E, and at 80.50 chains came to a "lighter stake" in place. He continued on down the same line looking for the pond which Hamblin calls for on the west line of section 24. He found the pond, but it was to the west of the line on which he was running.

He then came back to the point R and ran along the road N 0° 54' W 80 chains, the distance Hamblin calls for between the southwest and northwest corners of section 12, but found no evidence of an established corner. Putting in a temporary stake at this point he turned east and looked for marked trees. He found one, a 30 in. oak, which stood 2.15 chains east of the road. This tree had a blaze on both its eastern and western sides. (He later cut into this tree and found that it showed signs of the blazes for "over fifty rings" from the other surface.)

After he had made certain examinations which need not be here noted, he went to the known corner post (N) on the south line of the township which Apthorp had set for the corner of sections 36 and 35, at which point Hamblin began his survey of the section lines of the eastern tier of sections in the township.

From this point he ran N 0° 54' W which, making appropriate correction for the variation of the needle, is the line called for by Hamblin's field notes. At eighty chains from his starting point he found no evidence of a corner. He then sought for marked trees east and west of the line, and running an east and west line from a point 78.77 chains from his starting point, he found blazed side line trees both east and west of his north and south line, indicating "a line crossing" at that point. He cut into these trees and found evidences of the blazes at fifty-eight and fifty-five annual rings from their outer surfaces. On this evidence he accepted the point 78.77 (N 1) as Hamblin's corner to sections 36 and 25, though it was 1.23 chains short of the distance called for.

Continuing the same course northward he found evidence that he was retracing the line run by Hamblin. At eighty chains north of N 1 he found none of the witness trees called for by Hamblin nor any evidence of a line crossing, but he did find an old corner stake lying on the ground there. He accepted this point (N. 2) as Hamblin's corner of sections 25 and 24, the southwest corner of 24.

Continuing his north line he came to a pond, the center of which he located as 33.33 chains north of the southwest corner of section 24. Of this pond Gove says:

"That is the only pond in that vicinity. It is about 200 feet in diameter and has a mud bottom. Most of these flats out there are of a hard sand bottom. The water during a period of rain will stand there a time and be probably shoe deep, but not a permanent pond, while this pond is a permanent pond. He calls for that pond at a distance of forty chains because he set a quarter corner in the pond; it was too deep to raise a mound and he simply set a stake. You can sink as deep in the mud as you do in the water." The plat he filed with his testimony shows a creek rising in and flowing south from this pond.

Continuing north in the same course across the pond, at 36.44 chains from the southwest corner of section 24, "We

crossed the border of grass land surrounding this pond into a pronounced line of pine and palmetto. He calls for forty-six chains."

Hamblin's field notes for the west line of section 24 read:

"North between sections 23 and 24

"32:00 to grass pond

"40:00 set post in pond for ¼ section corner. Could not raise mound.

"46:00 cross pond to pine.

"80:00 set post for corner to sections 13, 14, 23 and 24."

Upon these facts Gove makes this comment, which expresses the conclusion upon which his subsequent conclusions are largely based: "I find that pond at 36:44 chains from the southwest corner of section 24 a difference there of 9:56 chains, showing he did not set his stake in the center of that pond because this is a distinct mark. I find then he has made an error just prior to reaching the quarter corner, he has dropped ten chains as evidenced by the fact he is 9:56 chains short of the call distance." This is a conjecture, rather than a legitimate inference, and is based upon the assumptions that this pond was of the same size and the growth on the adjacent lands had the same characteristics in 1873 as in 1931; and that Hamblin meant by his call "46:00 cross pond to pine" what Gove found to be "a pronounced line of pine and palmetto" at 36:44 chains from the southwest corner of section 24. According to Hamblin's notes the pond he found there was at least eight chains (528 feet) across, while at the time Gove made his survey he found that it was only 200 feet in diameter.

He continued on his original line N 0° 54′ W until he came to State highway No. 25, but after leaving the pond found no evidence of any corners, markings, or other evidence on the ground, to show that it had been run by Hamblin.

At the point (M 3) 80:50 chains south of the point R to which he had run in his preliminary examination, he found

a "lighter stake" which someone had set at the southwest corner of section 13 (northwest corner of 24). "Feeling," he says, that this point was very close to being the southwest corner of section 13 as established by Hamblin, he came back to that point and found it to be 417 east of a point on his original north line and 74.40 feet north of the southwest corner of section 24.

Running east from this point (N 3) on a line N 89° 06' E he found at 39:94 chains three trees, whose courses and distances corresponded with the trees called for by Hamblin as witness trees for the quarter section post on the south line of section 13, but none of them bore marks more than twenty years old. Continuing eastward he intersected the township line at a point where he found a stake someone had set 614 feet south of the corner post set by Apthorp for the corner to sections 13 and 24, the point we have designated as M 3.

From point M 3 he ran a line west to his original north and south line, and found that it intersected that line at point N 4, which is 83:20 chains north of the southwest corner of section 24. Along this line he found no line markings of any kind. He projected this line eighty chains west of its intersection with his north line, but found no line markings on the projection. But along a line run 420 south of this projection he found these markings at these distances west of his north line. At 417 feet less than forty chains he found a "hub" which had been "recently" set for the quarter section post of sections 23 and 14; at 432 feet less than eighty chains a "lighter post" apparently set for the western corner between sections 23 and 14; and at eighty chains plus 107 feet another "lighter post" which someone had set also apparently as the western corner between sections 23 and 14.

Coming back to the point on his original north line 83:20 chains north of the southwest corner of section 24, he measured eighty chains, which he found carried him to a point 669 feet north of the road shown on the diagram from

S to R. Running N 89° 06′ E from this point, at 418 feet, he crossed the road which is shown on the diagram as running from R to K; at 25:20 he passed fifty feet south of a ten inch pine tree which had thirty-five rings and was blazed on its south side, which "evidences some subsequent survey, whose I don't know." He intersected the township line at the known point at which Apthorp had set the post for the corner to sections 13 and 12, where he found a "scribed lighter post" and one pine tree and two pine stumps which fitted Apthorp's call for witness trees for this post.

He then went back to the point R from which he had started his preliminary investigation. Assuming that the road running west from that point was on the south line of section 11, he proceeded westward along that road, and "about 25:92" chains west of R he found a 12 foot bridge, which is over "a recognized cross line of drainage." Hamblin's field notes for the south line of section 11 call for the line to cross "a slight lead" at a point 25:92 chains west of its southeast corner.

Returning to the point R, he extended the line of the road eastward to the township line. At seventeen chains east of the road he found an eighteen inch pine on the line he was running. "This tree showed very little, if any, evidence of interior markings, but a slight swell on each face, and on cutting into this tree I found the northwest and northeast faces both blazed, not directly opposite one another, but the blazes approximately the same angle on the northeast and northwest facing. * * * I cut two blazes from which I found fifty to fifty-five rings." At 39:86 chains he found a fourteen-inch lighter post, and at 59:18 an eighteen-inch lighter post. Continuing east he intersected the township line at an unmarked point, 680 feet south of Apthorp's corner for sections 12 and 13.

Running S 0° 54′ E from the point R he found a "lighter post" at 39:72 which someone had recently set (he says, he

assumes in 1925 or 1926 as a quarter section post for sections 13 and 14), from which post a fence ran west.

Running north from R along the road he found fences running to the road from the west at 19:86, forty and sixty chains.

In addition to the facts above stated, Gove testified that he noted the natural features such as "prairie," "pine," "pine and scattering cabbage," "wet prairie to pine land," etc., called for in Hamblin's field notes along the lines of section 24, 13 and 12; and that the call distances for such features do not fit these features, as he observed them on the ground, as well when these lines are run in accordance with Hamblin's field notes, as they do when they are run upon the assumption that Hamblin's north and south line from the pond northward was run about 417 feet farther east, and the south and north lines of section 13 intersect the township line 614 and 680 feet, respectively, south of the points at which Apthorp set posts for the southeast and northeast corners of section 13. But it is to be remembered in this connection that fifty-eight years had elapsed between the time that Hamblin and Gove made their surveys, and such natural features as Hamblin mentioned may have undergone material changes between the time of the two surveys.

From the above mentioned physical facts, and his conjecture that between the southwest corner of section 24 and the point at which he set his stake in the pond for the quarter section of section 24, Hamblin dropped ten chains (660 feet), Gove reaches the conclusion that when he left the pond Hamblin ran his north line 417 feet farther east than he was running before he reached the pond, and established his southeast corner of section 12 at point R, which is 669 feet farther south than his field notes call for.

Acting upon this conclusion he measured north along the road the distance called for by Hamblin between the southwest and northwest corners of section 12, i. e., eighty chains, at which distance he found no evidence of a corner having

been established there by Hamblin. However, feeling that he had "demonstrated that it" (the thirty-inch oak heretofore mentioned) "should be from findings lower down on the north line of section 12," and finding that the call distance (eighty chains) brought him to a point 2:15 chains west and twenty-one feet south of this oak, he moved up twenty-one feet north to a point in the road west of this oak. From this point X he ran a line N 87° 06′ E through the oak to a township line at point Y, which is 711 feet south of the post set by Apthorp as the corner to sections 1 and 12. At the point Y he found no evidence of a corner. In addition to this oak, he found on this line, at a distance of 2,412 feet (about 36.55 chains) east of Point X, a 12-inch pine with a twenty-year old blaze, which, he says, "is not an original marking at all, but someone in their endeavor to locate the lines about that time has marked that tree as some subdivision marking." But it is to be noted that a point 36:55 chains from a section corner is not the corner of any recognized subdivision of a section, or quarter section. The only "natural feature" noted by him on this line was that the line at 7:80 chains east of X came to "pine and palmetto." The first call in Hamblin's field notes for the line between sections 1 and 12 is "7:00 to pine and scattering cabbage."

Running north from the point X he crossed State highway No. 25 at 10:83 chains; and 25:38 chains north of the highway he came to a fence which he accepted as being on the north line of section 1. Hamblin's field notes call for the length of the western line of section 1 as 25:53 chains. Running north from point Y along the east line of the township he came at 711 feet to the point where Apthorp set a corner post for sections 1 and 12, and found that the distance from Apthorp's corner to State highway No. 25 at D is 24:20 chains. Hamblin's field notes call for the length of the eastern line of section 1 as 23:85 chains.

The testimony of John H. Caldwell, Jr., corroborates the testimony of Gove as to the physical facts found by Gove

on the ground; but otherwise adds nothing to the force or effect thereof.

For the defendant to sustain his plea of set-off, the burden is upon him to prove that Hamblin in fact established the southern corners of section 1 and ran the south line of the section south of the corners and line called for by his field notes. Under the facts of this case the evidence introduced by the defendant for this purpose falls short of that clear and convincing evidence, which is, as a matter of law, required to overcome the presumption that Hamblin's field notes correctly described the corners and lines of section 1 as run by him, and that as he correctly located and identified the corner set by Apthorp for the southeast corner of section 1. It is, therefore, insufficient to support a verdict finding that Hamblin established the corners of the section and ran the south line thereof on the ground substantial distances south of the corners and line called for by his field notes.

For this reason we are of opinion that the court did not err in striking out the defendant's evidence, and that the judgment of the court should be affirmed.

*Affirmed.*